```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW MEXICO
                       ALBUQUERQUE DIVISION


UNITED STATES OF AMERICA,    )    CASE NO: 1:14-MJ-00513-ACT
                             )
          Plaintiff,         )         CRIMINAL
                             )
    vs.                      )     Albuquerque, New Mexico
                             )
EDDIE MITCHELL,              )    Friday, February 21, 2014
                             )
          Defendant.         )    (9:46 a.m. to 10:02 a.m.)


              PRELIMINARY EXAMINATION / DETENTION HEARING

             BEFORE THE HONORABLE ROBERT H. SCOTT,
                UNITED STATES MAGISTRATE JUDGE
```

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | PRES. TORREZ, ESQ.<br>U.S. Attorney's Office<br>P.O. Box 607<br>Albuquerque, NM 87103 |
| For Defendant: | ALONZO J. PADILLA, ESQ.<br>Office of the Federal Public Defender<br>First State Bank Building<br>111 Lomas Boulevard NW, Suite 501<br>Albuquerque, NM 87031 |
| Clerk: | C. Lopez |
| U.S. Probation/Pretrial: | Sandra Avila-Toledo |
| Court Reporter: | Recorded; Liberty (ABQ - Gila) |
| Transcribed by: | Exceptional Reporting Services, Inc.<br>P.O. Box 18668<br>Corpus Christi, TX 78480-8668<br>361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

## INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KEVIN SMALL | 3 | 8 | | |

**ARGUMENT RE CONDITIONS OF RELEASE**

| | | |
|---|---|---|
| BY MR. PADILLA | | 14 |
| BY MR. TORREZ | | 15 |

| | |
|---|---|
| FINDING(S) / RULING(S) OF COURT | 13 / 16 |

\

Small - Direct / By Mr. Torrez                                    3

**Albuquerque, New Mexico; Friday, February 21, 2014; 9:46 a.m.**

1              **(Call to Order)**

2         **THE CLERK:** *United States of America versus Eddie*

3  *Mitchell.*

4         **MR. PADILLA:** Your Honor, this will not be a waiver,

5  and I would like to address the Court after the hearing

6  regarding conditions of release if that's possible.

7         **THE COURT:** Yes, sir.  You can have a seat with your

8  client.

9         Is the Government ready to proceed?

10        **MR. TORREZ:** Yes, your Honor.

11        **THE COURT:** You may call your first witness.

12        **MR. TORREZ:** We'll call Kevin Small to the stand.

13           **KEVIN SMALL, GOVERNMENT'S WITNESS, SWORN**

14        **THE CLERK:** Will you please have a seat.  If you can

15  state and spell your last name for the record, please.

16        **THE WITNESS:** My name is Kevin Small, S-m-a-l-l.

17        **THE COURT:** Counselor, your witness.

18                     **DIRECT EXAMINATION**

19  **BY MR. TORREZ:**

20  Q    Mr. Small, with whom are you employed?

21  A    I'm employed by the United States Department of Justice

22  Drug Enforcement Administration.

23  Q    And where are you presently assigned?

24  A    I'm assigned to the Albuquerque, New Mexico District

Small - Direct / By Mr. Torrez    4

1  Office, the Drug Interdiction Unit.
2  Q    And will you briefly outline -- would you please briefly
3  outline your experience as a Drug Enforcement Administration in
4  this district?
5  A    My experience education or just professional?  Both?
6  Q    Both.
7  A    I have an undergraduate degree in criminal justice from
8  Northeast Missouri State University.  I have a law degree from
9  Washburn University School of Law.  Passed the New Mexico Bar
10 in 1984.  Since 1987, I've been assigned to the Albuquerque
11 Interdiction Group, which focuses our investigation -- it's at
12 the Albuquerque International Airport, the Amtrak train station
13 and the Greyhound bus station, intercepting drug couriers on
14 board those modes of transportation.
15 Q    Okay.  And how long have you worked at the Amtrak station
16 here in Albuquerque?
17 A    Since 1988.
18 Q    Now, calling your attention to February the 19th, 2004,
19 did you on that particular day encounter the Defendant named in
20 this Complaint, Mr. Eddie Mitchell?
21 A    I did.
22 Q    And can you point him out to the Court?
23 A    Yes.  He's the male sitting at the defense attorney table
24 wearing the black -- the white -- I don't know what color shoes
25 those are -- green shoes with a red jumpsuit.  And he has

1  glasses laying on the table in front of him.
2          **MR. TORREZ:**  I'd ask the Court to accept the
3  identification of the Defendant.
4          **THE COURT:**  The record shall so reflect.
5       **(Witness identified Defendant)**
6  **BY MR. TORREZ:**
7  Q    Now, tell us if you would how was it that you encountered
8  Mr. Mitchell on that day and what was taking place.
9  A    He was on board Amtrak Train Number Four when it arrived
10 into Albuquerque, roughly, around 10:45.  I was standing in a
11 sleeper car, sleeper car 430, just standing in the vestibule
12 area, standing by the door.  And Mr. Mitchell came out of a
13 bathroom and literally stood right next to me.
14          At that time I showed him my DEA badge.  I said,
15 "Hello, sir.  How are you doing?  I'm with the police
16 department.  May I speak to you for a moment?"
17          He said, "Sure."  Where are you headed to?  And he
18 said he was headed to St. Louis.  Where are you coming from?
19 Los Angeles.
20          I said, "Do you have your ticket with you?"  And he
21 said he did, and he walked back to a room.  He was in Room 14
22 of sleeper car 431.  Reached into the room and his ticket was
23 somehow cut in two, somehow it had been cut in two.  The name
24 on the ticket was Eddie Mitchell.  He was showing traveled to
25 St. Louis, Missouri.

1    I returned the ticket to him and asked if he had his
2 I.D. with him.  And he showed me a non-driver's license from
3 the state of Missouri with the name of Eddie Mitchell on it.
4    I returned it to him and I said -- I told him what's
5 going on.  Mr. Mitchell, I work for the Drug Enforcement
6 Administration, DEA.  We have a problem aboard the train.  When
7 you got on in LA there's no security.  We have a problem with
8 people smuggling guns, drugs and contraband.
9    I said, "Do you have any luggage with you today?"  He
10 said, "Yes, I do" and he said it was in his room.  And we were
11 standing right by his room.
12    I said, "You don't have any guns, drugs or contraband
13 in it do you?"  He goes, "No."
14    I said, "Would you consent for me to search it?"  He
15 said, "Sure."  And he reaches in and pulls down a suit hanging
16 bag that you get like you put a suit jacket in with a pair of
17 pants.  I said, "That's all you have?"  He goes, "Yes."
18    So and he also had a jacket I think.  Obviously, I
19 checked that; there was nothing in it.  I said, "You don't have
20 any drugs in your room or anything do you?"  He said, "No."  I
21 said, "Would you give me permission to search the room?"
22    I searched the room and found nothing.  I then turned
23 to him -- he was standing in the hallway -- I said,
24 "Mr. Mitchell, you don't have anything strapped to you today do
25 you?"  He goes, "No."  I said, "Would you voluntarily consent

1  for me to search you?"
2          He didn't say anything. He just stepped back and put
3  his hands up like that, (indicating), which I believed to be
4  implied consent. At that time I checked his chest, his legs
5  and then in his groin area I felt an object that wasn't
6  consistent with the human anatomy, which I knew immediately to
7  be drugs.
8          So I placed him under arrest. We transported him
9  back to the office where he was searched, and we seized a
10 kilogram of cocaine from his pants.
11 Q    Okay. Describe again how he had it on his body.
12 A    It was he had a pair of two spandex like workout pants and
13 his underwear. It was underneath the two spandex pants. The
14 spandex pants kept it in place. It was a large ball, about two
15 pounds of cocaine.
16 Q    Okay. Was there later on an examination to make -- at
17 least a field examination to determine whether or not it was
18 cocaine?
19 A    Yes. I weighed it and it weighed 1.2 gross kilograms of
20 cocaine. And I field tested it and I received positive result
21 for cocaine.
22 Q    Okay. And -- strike that.
23          **MR. TORREZ:** I'll pass the witness, your Honor.
24          **THE COURT:** Mr. Padilla, your witness.
25          **MR. PADILLA:** Thank you, your Honor.

1                       **CROSS EXAMINATION**

2  **BY MR. PADILLA:**

3  Q    Now, Agent Small, you've been doing this for quite a

4  number of years, correct?

5  A    Yes, sir, I have.

6  Q    And you have pretty much a habit of recording all these

7  encounters.

8  A    That's correct.

9  Q    And this encounter was recorded from beginning to end?

10 A    Yes, sir, it was.

11 Q    And did you go back and check to see if that tape

12 recording, in fact -- or tape recorder was working properly?

13 A    Yes.  I used a tape recorder to write the Criminal

14 Complaint.

15 Q    Okay.  Now, when you got on the Amtrak train you were

16 already alerted, were you not, to the fact that Mr. Mitchell

17 was someone of interest that you wanted to talk to?

18 A    Yes, sir.

19 Q    And you received a copy of a plain -- I mean the train's

20 manifest that listed the passengers and how they purchased

21 their tickets and things of that nature?

22 A    I didn't receive a copy of the manifest.  I received

23 copies of certain reservations.

24 Q    And this was sent to you by, I guess, a representative of

25 Amtrak or someone that works at the Amtrak station in

Small - Cross / By Mr. Padilla                                               9

1  Los Angeles, correct?
2  A    That's not correct.
3  Q    But someone associated with Amtrak provided that
4  information to you, correct?
5  A    Yes.
6  Q    And it was essentially the information that identifies
7  individuals that may purchase their ticket pretty close to the
8  departure of the train with cash?
9  A    Not always cash but just within three days or four days of
10 the date of departure.
11 Q    But that's what you're looking for.
12 A    Yes, sir.
13 Q    And so when you got on that Amtrak train you already knew
14 you wanted to talk to Mr. Mitchell, correct?
15 A    Yes, would like to have a conversation with him.
16 Q    And he was -- his sleeper was located in the area where
17 you first encountered him.
18 A    Yes, sir.
19 Q    And your intention, in fact -- let me ask this.  When you
20 first got on that train I assume you went straight to the
21 sleeper where you knew he would be staying.
22 A    Not to his right away.  We went to another sleeper.
23 Q    But you knew what sleeper he was in.
24 A    Yes, sir.
25 Q    And you got the information you needed from your source of

1  information or from talking to the conductor.
2  A    Not from the conductor.  From the source of information.
3  Q    Either way your intention was to go talk to Mr. Mitchell
4  before that train left Albuquerque.
5  A    Our intention was to see if Mr. Mitchell would talk to us,
6  yes, sir.
7  Q    Okay.  And he did agree to talk to you.  He was
8  cooperative?
9  A    Yes, sir.
10 Q    Answered your questions.
11 A    Yes, sir.
12 Q    Provided you with a copy of his train ticket, correct?
13 A    Yes, sir.
14 Q    And also his I.D.  And his I.D. matched the train ticket,
15 so he wasn't trying to travel under a false name or anything.
16 A    No, sir, he was not.
17 Q    And in terms of the questions you asked him about
18 searching his luggage, that was a question he answered
19 verbally.
20 A    Yes, sir.
21 Q    And when you asked -- after not finding anything on his --
22 or in his luggage or in his room, you decided to go ahead and
23 pat him down.
24 A    Search him, sir.  Yes, sir.
25 Q    That's when you asked for his permission.

1  A    Yes, sir.

2  Q    And you indicated that his actions of putting up his arms

3  you felt were, in a sense, an implicit type consent.

4  A    Yes, sir.

5  Q    But you could have waited and asked him again, could you

6  not, to get that on tape?

7  A    I can't make him answer me.  If I make the man --

8  Q    Right.  But you've been in that position before being

9  cross examined by attorneys on many occasions.  I'm sure that's

10 one of the questions that has come up in terms of why you

11 didn't wait for a verbal response, why there is not a verbal

12 response on the recording.

13 A    I've been asked that question many times and I -- when I

14 get consent, either verbally or non-verbally, I'll take the

15 consent they give me.

16 Q    Right.  But if it's tape recorded, obviously it's

17 written -- this is not a video recorder so we can't really see

18 his hands going up.  That's just based on your observation.

19 A    That's correct.

20 Q    And you had time to ask him again for a verbal response

21 and you didn't do that.

22 A    That's correct, I did not.

23 Q    And once you found what I guess you were looking for in

24 terms of the cocaine, he was arrested and continued to be

25 cooperative with you at that point?

1  A     Yes, sir.
2  Q     And did he provide any post-arrest statements to your
3  knowledge?
4  A     No, sir, he did not.
5  Q     And did you talk to him about where he lived and verified
6  that he was a lifelong resident of St. Louis?
7  A     Yes, sir.  Grew up in St. Louis, born there and had lived
8  there for many years.
9  Q     And that's where all his family is located?
10 A     Yes, sir.
11 Q     And your conversation indicated that there were no
12 warrants that you were aware of at that point that were
13 outstanding or were you aware of any?
14 A     I'm not aware of any warrants.
15 Q     And in terms of property that was on him you didn't find
16 any large amounts of cash?
17 A     No, sir.
18 Q     In fact, it was like a hundred dollars or so?
19 A     Yes, sir.
20 Q     No weapons, anything of that nature?
21 A     No, sir.
22 Q     And again, during the time that you were talking to him
23 after you arrested him or even before that he wasn't
24 threatening in any way towards you?
25 A     No.  Mr. Mitchell is a very pleasant person.

1  Q    Okay.
2         **MR. PADILLA:**  I have no further questions, your
3  Honor.
4         **THE COURT:**  Is there any redirect?
5         **MR. TORREZ:**  No redirect, your Honor.
6         **THE COURT:**  All right.  May this witness be excused?
7         **MR. TORREZ:**  He may.
8         **THE COURT:**  You may step down, Agent Small.  You are
9  excused from the proceedings.
10        **(Witness excused)**
11        Does the Government have any further evidence or
12 testimony it wishes the Court to consider?
13        **MR. TORREZ:**  We do not, your Honor.
14        **THE COURT:**  Does Defense have any evidence or
15 testimony it wishes to put forward?
16        **MR. PADILLA:**  Not from (indiscernible) detention.
17        **THE COURT:**  All right.  The Court has read and
18 considered the Affidavit in support of the Criminal Complaint,
19 as well as the testimony of the witness here this morning, and
20 I do find probable cause to believe that an offense has been
21 committed and that this Defendant committed it, and I bind the
22 matter over for further proceedings.
23        Mr. Padilla, do you wish to speak to his conditions
24 of release?  And in doing so I've received, read and take
25 judicial notice of the Pretrial Services Report.

1    **MR. PADILLA:**  Your Honor, and I'm sure one of the
2  Court's concerns is the warrants that are showing up on the
3  report.  My client indicates the warrants that are there are
4  for traffic tickets.  I think the last one he might have gotten
5  was the failure to register the vehicle, didn't have money at
6  that time to pay for it, and he understands that is a problem.
7             But he's not a flight risk.  He wants to go back to
8  his family in St. Louis.  He was actually close to getting
9  married to his fiancé.  They have adult children.  But I
10 don't...
11            Concerning the Court's concerns, what I'm asking the
12 Court to do is release him to the halfway house here in
13 Albuquerque, not to allow him to go home.  I think the Court
14 would have some issues with that.  But I think if he's here in
15 Albuquerque he can be monitored by Pretrial Services, he can
16 find work and be able to stay busy while this matter is
17 pending.
18            He has a criminal history but the most serious
19 offense on his record occurred when he was 17 years old.  And
20 he's in his forties now, so we hope the Court will not hold
21 that against him because he has been doing overall well in
22 terms of staying out of trouble as far as major violations are
23 concerned.  And as the Court knows, most of the violations that
24 show up are for traffic violations after 2007.
25            So again, given that, your Honor, we would ask the

1  Court to consider releasing him to the halfway house.
2          **THE COURT:**  Thank you, Counsel.  Does the Government
3  wish to be heard?
4          **MR. TORREZ:**  Your Honor, it appears that he's got a
5  previous conviction that involves violence.  And I think that
6  goes to the -- his capacity, and also because of the present
7  violation we have another drug violation that looks like it was
8  a felony level, which I think makes this a presumption case.
9  And then we have three failures to appear, your Honor.  So
10 certainly -- and in different states.
11         And so I would think that the assessment by Pretrial
12 Services that these prior failures to appear make him a
13 candidate or someone who would, indeed, not obey the Court's
14 order and not appear when ordered; and based upon the present
15 charge it indicated that he's a danger to the community.
16         **MR. PADILLA:**  If I may just respond --
17         **THE COURT:**  Yes, sir.
18         **MR. PADILLA:**  -- briefly, your Honor?
19         **THE COURT:**  You may.
20         **MR. PADILLA:**  Again, the charges that, you know, I
21 don't -- these are serious charges, happened 30 years ago.  He
22 was 17, 18 years old when those occurred.  He's now 47.  So
23 again, those were 30 years ago and he did a lengthy prison
24 sentence for someone that was that young.  But he's got all
25 that behind him.  He doesn't have any violations from other

1   states.  I'm not sure where the Government picked that up, but
2   they all seem to be charges out of Missouri.
3          **(Pause / Voices heard off the record)**
4              Yeah, they're all from the same county.  They're not
5   from different locations; they're all from the same --
6          **MR. SPEAKER:**  Not from different states, just from
7   different counties.
8          **MR. PADILLA:**  I wanted to bring that to the Court's
9   attention that the failures to appear or the warrants are for
10  traffic citations, your Honor.
11         **THE COURT:**  Thank you, Counsel.  As I indicated, I
12  have read, reviewed and take judicial notice of the Pretrial
13  Services Report.  I agree with their recommendations.  I'm
14  going to remand him back to the custody of the marshal.
15             I also agree and concur with the arguments propounded
16  by the Government.  He's got five active warrants for him.  The
17  Government said three failures to appear.  I count four.  And
18  the reference to the matter when he was 17, the Court notices
19  that was the kidnapping, the robbery, the stealing of the motor
20  vehicle.  He immediately violated that term of probation and
21  was sentenced to ten years' confinement.
22             So for reasons stated I find him to be a substantial
23  flight risk and a danger to the community.  I'm remanding him
24  to the custody of the marshal.  We'll be in recess.
25         **(Defendant remanded)**

1     MR. TORREZ:  Thank you.

2     (This proceeding was adjourned at 10:02 a.m.)

3

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____            March 4, 2014_

TONI HUDSON, TRANSCRIBER

EXCEPTIONAL REPORTING SERVICES, INC