## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

              Plaintiff,

     vs.                                                   No. 14-CR-777-MV

EDDIE MITCHELL,

              Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Eddie Mitchell's Motion to Suppress Evidence and Statements and Memorandum in Support Thereof [Doc. 23].  The government responded [Doc. 29] and Mitchell replied [Doc. 35].  The Court, having considered the Motion, briefs, relevant law, witness testimony, and being otherwise fully informed, finds that the Motion is well-taken and will be **GRANTED**.

## FACTUAL BACKGROUND

This motion centers on an encounter between Defendant Mitchell and DEA agents on an Amtrak train during a brief stop in Albuquerque, New Mexico en route to points east.  In an effort to resolve the complex factual issues presented in the briefs and to gain better purchase on the details of the dispute, the Court requested a hearing on the Motion.  The Court permitted wide-ranging testimony and encouraged detailed elucidation of the facts in a hearing that spanned approximately six hours and produced a transcript over two hundred pages long.  In the

1

interest of brevity and clarity, the Court will cabin its discussion of the facts to those issues material to the disposition of the pending Motion.

On February 19, 2014, Drug Enforcement Agency ("DEA") Special Agents Jarrell Perry and Kevin Small[1] arrived at the Albuquerque, New Mexico Amtrak station with Task Force Officer Rudy Mora to work interdiction and search passengers for contraband. *See, e.g.*, Hearing Transcipt at 11-12.[2]  The agents focus on trains and buses, according to Special Agent Small, because "people who work interdiction know that Amtrak is an easy mode of transportation to smuggle contraband, drugs, anything that you don't want to be intercepted." *Id.* at 9.  That day, as on previous occasions, the officers "reviewed some reservations" prior to beginning their work on the train, "looking for one-way tickets bought within three days of the date of departure" because, in the officers' experience, many of the people arrested for carrying contraband on trains travel with tickets purchased within  that window. *Id.* at 11- 12.  Special Agent Small later explained that, in his estimation, Amtrak travel in general, and sleeper cars in particular, are suspicious because the tickets may cost more than comparable airfare and because some drug mules have expressed an appreciation for the privacy afforded by Amtrak cabins. *Id.* at 15-18.  Defendant Mitchell apparently met these criteria; he "had bought a one-way ticket, cash ticket" for an "economy sleeper" cabin at the station in Los Angeles approximately half an hour before the train was scheduled to depart. *Id.* at 19.

---

[1]  The Court learned during the hearing that Small had since left the DEA, but in the interest of consistency, the Court will refer to him as "Special Agent Small," throughout its opinion, even though he was not a Special Agent when he testified.

[2]  Citations to the Hearing Transcript refer to a "rough edited" version provided to the Court by its court reporter; the Court occasionally employs direct quotations, it should be understood that the general thrust of the quote is accurate although the precise phrasing may not be.  This transcript has not been entered on the docket and is included for reference only.

The train car in which Mitchell had booked passage is a Superliner car used for Amtrak's Southwest Chief service between Los Angeles and Chicago. *See Id.* at 20. Given that the entire drama around which this Motion revolves unfolds in the cramped confines of a single train car, particular attention must be given to the physical configuration of this space. To this end, the Court has included, purely by way of visual aid, a diagram that offers a stylized overhead view of an Amtrak Superliner car; at the hearing held on this Motion, both parties acknowledged that the illustration accurately depicts the variety of sleeper car in which Mitchell's roomette was located. *Id.* at 225-226.



As is apparent both from the diagram and from testimony, the Superliner is a bi-level car, with sleeping accommodation both on the first and second floors. On the lower level, in the middle of both sides of the Superliner, there are exterior doors. *Id.* at 21. The sole passageway on the lower level runs along the longitudinal axis of the car; the narrow corridor terminates in an interior door at each end of the train, one of which leads to a "family sleeper" and the other of

which opens into a restroom.  *Id.* at 20-21.  Near the external doors in the center vestibule area is a small staircase that connects the first level of the car to the second; the upper level of the car also has two "external" doors, but these are located at the front and back and connect this car with those adjacent to it in the train configuration.  *Id.* at 137-38.  While the train was stopped in Albuquerque, only one of the doors on the lower level was open; its twin faced active track within the station and therefore remained locked.  *Id.* at 20-21.  Thus, the sole point of ingress to or egress from this car on the first level was the door open to the station platform.

On this trip, Mitchell occupied "roomette" number fourteen, which sits between the vestibule and the family bedroom that caps one end of the Superliner on the first floor.  Special Agent Small estimates that it is approximately nineteen feet "from the vestibule to the family sleeper room" and that this hallway is approximately two feet wide.  *Id.* at 22.  Special Agent Small first encountered Mitchell near the open exterior door after Mitchell exited one of the restrooms.  *Id.* at 23.  Special Agent Small then "pulled up [his] DEA badge" and indicated that he was a law enforcement officer.  *Id.* at 24.  After a brief interruption from another passenger who requested assistance from Amtrak staff, Special Agent Small refocused on Mitchell and asked if he could speak with him; Mitchell acceded to the request.  Recording[3] at 0:48.  Mitchell and the special agent then briefly discussed Mitchell's travel to Los Angeles by airplane and return home to St. Louis; evidently, Special Agent Small's curiosity was aroused because, in his experience, one-way Amtrak travel forms part of the profile of a narcotics courier.  *See, e.g.*, Hr'g T. at 31-32.

---

[3] Citations to timestamps in the Recording refer to an audio recording of the encounter made by a device worn by Special Agent Small and entered into evidence at the hearing as Government's Exhibit #1.

During this conversation, Mitchell thrice expressed his desire to speak with a conductor about getting a replacement for his ripped ticket; Special Agent Small alternately ignored Mitchell's statement and replied that the ripped ticket "won't hurt [him]."  Recording at 1:17.  *See also* Hr'g T. at 30.  While the government argues that this was a ploy and therefore represents a conspicuous effort by Mitchell to extricate himself from a conversation with the DEA, the Court is not persuaded by this interpretation of events.  There is no evidence to suggest that Mitchell was aware of the insignificance of his physical travel document; the bare assurances from a DEA agent that Mitchell had no reason to believe was an authority on Amtrak ticketing procedures does not alter this reality.  Indeed, Special Agent Small later admitted that people who do not regularly travel on Amtrak might reasonably seek assurances from Amtrak personnel upon realizing that their travel document had torn.  *Id.* at 114.

Despite Mitchell's indication that he wanted to find an Amtrak representative, Special Agent Small continued his questioning, asking for Mitchell's identification and explaining that "we [have] a problem with people smuggling drugs, guns, and contraband."  Recording at 2:03.  Special Agent Small then asked if Mitchell "had any luggage with [him] at all" and requested permission to search the garment bag in Mitchell's room; Mitchell consented to the search, assuring Special Agent Small that he was "more than welcome" to search the bag.  *Id.* at 2:11.  Upon investigation, it became clear that the bag contained nothing more than a suit and tie, which Special Agent Small viewed as inconsistent with a multi-day trip to Los Angeles.  Hr'g T. at 41; Doc. 29 at 6.  Following up on this suspicion, Special Agent Small inquired, "you don't have anything else in your room, do ya?" to which Mitchell volunteered, "no sir, you're more than welcome…"  Recording at 2:36.  Special Agent Small interjected "give me permission to

search your room real fast; is that all right?"  Mitchell evidently consented, responding, "yeah, you all right."  *Id.* at 2:41.  Special Agent Small searched the room, including a grocery sack, after receiving Mitchell's permission and, again, found nothing indicating illegal conduct.  Special Agent Small noted at the hearing that Mitchell's accommodative behavior was also suspicious as he "was too pleasing" and "wanted me to search everything."  Hr'g T. at 36.  The Court accords this observation of purported nervousness little weight.  As the Court observed, Special Agent Small, not Mitchell, was "the one that sounds rather excitable on the tape.  [It] sounded like [Small] had way too much coffee that morning" in part because he frequently "interrupt[ed] [Mitchell's] answers" and spoke "very fast."  Hr'g T. 119-120.  Further, the Court has little doubt that had Mitchell been more reserved in his interactions with law enforcement, Special Agent Small would have decided that this, too, was suspicious.

Having searched Mitchell's roomette and personal effects, Special Agent Small commented that Mitchell had "a loose top" and asked "you don't have anything strapped to you, do you?" followed almost immediately by "will you give me permission to search you real fast?"  Recording at 3:50.  At this point the accounts differ sharply and, unfortunately, the lapel recording offers little insight:  Mitchell does not audibly respond to the request, but the recording makes clear that Special Agent Small began to pat down Mitchell within a second of asking for permission to do so and arrested him approximately five seconds after beginning his physical search of Mitchell's person.  *Id.* at 3:53.  According to Special Agent Small, Mitchell had non-verbally consented to the search by "put[ting] his hands up like he was reaching for the sky" and "just [standing] there."  Hr'g T. at 43.  Mitchell agrees that he raised his hands in response to Special Agent Small's request, but, crucially, adds that he "shook [his] head no" and only raised

6

his arms because he "felt [he] had no choice." *Id.* at 175-176. *See also Id.* at 221 ("There is no

doubt in my mind. I know I shook my head no."). Later Mitchell elaborated that "I believed I

was under arrest so I put my hands up." *Id.* at 220.

## DISCUSSION

### I.  Categories of Fourth Amendment Encounters

The Fourth Amendment provides that "the people" have a right to be free from

"unreasonable searches and seizures" by government officials. *See, e.g.*, U.S. Const. amend. IV;

*Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *United States v. White*, 584 F.3d 935, 944 (10th Cir.

2009). In the context of "police-citizen" encounters, there are three constitutionally-distinct taxa

of interactions: "'(1) consensual encounters which do not implicate the Fourth Amendment;

(2) investigative detentions [*Terry* stops] which are Fourth Amendment seizures of limited scope

and duration and must be supported by a reasonable suspicion of criminal activity; and

(3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by

probable cause.'" *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting *United*

*States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir. 1996)).

"[F]or consent [to search] to be valid" the Tenth Circuit has demanded that: "'(1) There

must be a clear and positive testimony that consent was unequivocal and specific and freely

given; and (2) the government must prove consent was given without duress or coercion, express

or implied.'" *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (quoting *United*

*States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992)). *See also United States v. Jones*, 701 F.3d

1300, 1317 (10th Cir. 2012) ("Voluntary consent consists of two parts:  (1) the law enforcement

officers must receive either express or implied consent, and (2) that consent must be freely and

voluntarily given.") (internal quotation marks omitted).  Importantly for this case, while "a defendant's consent must be clear," it need not be given verbally; instead it may "be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  *Guerrero*, 472 F.3d at 789-90.

When determining if consent was freely and voluntarily given, courts ask whether a reasonable person would feel free to terminate the police encounter or if the consent was coerced.  *Id.* at 790 ("The second prong, requiring that the consent be free of coercion, turns on whether a reasonable person would believe he was free to leave or to deny the officer's request to search.").  In evaluating the voluntariness of apparent consent, courts in the Tenth Circuit look at several factors, including:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

*Jones*, 701 at 1313 (internal quotation marks and citation omitted).  The Court may also consider whether an officer informed the suspect that she is free to leave or refuse questioning.  *Id.*  None of these factors is dispositive.  *Id.*

Of course, "[t]hese categories are not static" and may change during the course of an encounter.  *White*, 584 F.3d at 945 (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1115 n.5 (10th Cir. 2007) (en banc)).  Consequently, "'[a] reviewing court must analyze each stage of the [police-citizen] encounter, ensuring that the requisite level of suspicion or cause is present at each stage.'"  *Id.* (quoting *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)).  The

government bears the burden of demonstrating that a given search was reasonable under the circumstances.  *United States v. Turner*, 553 F.3d 1337, 1344 (10th Cir. 2009).

## II.      The Fourth Amendment "Reasonableness" Requirement

If the Court determines than an encounter qualifies as a seizure, it must then evaluate whether or not the seizure and any attendant search were "reasonable" for the purposes of the Fourth Amendment.  *See, e.g.*, *United States v. Gordon*, 741 F.3d 64, 72 (10th Cir. 2014) ("The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable, at their inception or in their execution."); *Maryland v. King*, 133 S. Ct. 1958, 1969 (2013) ("the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.") (internal quotation marks omitted).  Hence, this analysis requires the Court to evaluate the type of encounter at issue and the circumstances surrounding the seizure.  *See United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) ("To determine whether a seizure is constitutional, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.") (internal quotation marks omitted).

The Fourth Amendment permits a *Terry* stop if it "is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. McHugh*, 639 F.3d 1250, 1255 n.3 (10th Cir. 2011) (internal quotation marks omitted).  That is, the "police can stop and briefly detain a person for investigative purposes" based on a reasonable suspicion that criminal activity may be occurring.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  This "level of suspicion" is "considerably less than proof by a

preponderance of the evidence or that required for probable cause." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (internal quotation marks omitted).  Indeed, reasonable suspicion only requires "some minimal level of objective justification." *Sokolow*, 490 U.S. at 7.

Whether reasonable suspicion exists is an objective inquiry that asks "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *United States v. McGehee*, 672 F.3d 860, 867 (10th Cir. 2012).  "In determining whether reasonable suspicion exists" courts evaluate the "totality of the circumstances" surrounding the encounter.  *Id*. (discussing *Terry*).  This inquiry accords some latitude to police officers to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Arvizu*, 534, U.S. 266, 274 (2002).  Even so, the Fourth Amendment demands that the police base a detention on "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005) (internal quotation marks omitted).  Of course, "[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules" and so this determination relies heavily on practical judgments. *Sokolow*, 490 U.S. at 7 (internal quotation marks omitted).

By contrast, an arrest requires that the police officers have probable cause.  *See, e.g.*, *Untied States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) ("[A]n arrest, unlike a *Terry* stop, requires probable cause.").  "A police officer has probable cause to conduct a search [or arrest] when the facts available to [her] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013)

10

(internal quotation marks omitted).  As with reasonable suspicion, "probable cause is not reducible to precise definition or quantification" and the Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach."  *Id.* (internal quotation marks omitted).

### III.    The Instant Case

a.  *Mitchell did not "unequivocally" consent to a pat-down search.*

Despite the significant effort and painstakingly-elicited testimony devoted to describing the precise choreography of the peripatetic four minute encounter, the Court believes that the resolution of the Motion hinges, at bottom, on a credibility determination.  Special Agent Small testified that Mitchell raised his arms to acquiesce to a search of his person; Mitchell counters that he lifted his palms in resignation and shook his head to indicate that the special agent did not have consent to search him.  Plainly, only one of these statements can stand.

After considering the testimony at the hearing, *Giglio* material reviewed *in camera*, and the audio recording in this case, the Court credits Mitchell's testimony and finds that Special Agent Small did not have unequivocal consent to search Mitchell.  First, although admittedly somewhat dated, there are instances of dishonesty in Special Agent Small's past that give this Court pause in assessing his honesty.[4]  Further, the special agent's coarse and unprompted description of the manner in which "the blacks" transport contraband and how this differs from the methods used by other racial and ethnic groups injects concerns about biased conduct and testimony into this Court's evaluation of the competing accounts, despite the government's attempts to rehabilitate its witness.  Hr'g T. at 9-11.  Second, the Court found Mitchell's

---

[4]  This information was filed with the Court *ex parte* and the Court will maintain that confidence here, as the details are not pertinent.

testimony compelling and has been presented with no reason to doubt his veracity as a witness. Finally, the Court finds that Mitchell's testimony is better substantiated by the available objective evidence and is therefore more credible overall.

For example, Special Agent Small's testimony exaggerates how close he and Mitchell were to the stairway, whereas Mitchell's recollection maps very neatly onto the Amtrak diagram. *Id.* at 92. Indeed, counsel for the government attempted to import Special Agent Small's characterization that the stairway was "about midway" between the vestibule and the family sleeper room into Mitchell's testimony via cross examination. *Id.* at 192. Mitchell accepted that this rough estimate was correct and then, after a brief dispute, proceeded to demonstrate physically the relative positions of the parties by standing next to a tape measure that counsel had laid on the courtroom floor. The government then chided Mitchell, explaining that he had "pushed the stairwell down to the 13, 14-foot mark," believing that it had caught Mitchell in an inconsistency or error. *See Id.* at 192-195. However, it is apparent from the Amtrak diagram that the position of the stairwell conforms much more closely to Mitchell's description than the version proffered by the government. Further, a consequence of this version of events is that Special Agent Perry was, undoubtedly, standing much closer to the stairs than Mitchell was, effectively blocking this means of egress, as discussed below.

Similarly, Special Agent Small and the government indicate that "Mitchell voluntarily walked away from SA Small" to speak with an Amtrak representative regarding his damaged ticket in an effort to demonstrate that Mitchell believed he was free to leave and to refuse the special agent's requests. *See, e.g.*, Doc. 29 at 23; Hr'g T. at 76-77. However, the fact that Special Agent Small's microphone picked up Mitchell's conversation with the train attendant

lends credence to his description, in which he remained relatively stationary and hailed the train attendant who had begun to descend the stairs.  *See* Hr'g. T. at 161.  That is, although Special Agent Small stated that the his microphone generally picks up the sounds "closest to" him, given that his recording device was located in his lapel and that he was kneeling inside of Mitchell's roomette, the fact that Mitchell remains audible over the rustling of the special agent's clothing supports the view that Mitchell did not "walk away."  *Id.* at 75-78.  Indeed, if Special Agent Small's version were correct, and the microphone had been able to pick up sounds from significantly down the corridor, presumably the device would have recorded *some* sound indicating Mitchell's departure.  *Id.* at 77.  The Court finds that the more likely conclusion is that, as above, Mitchell's version of events more accurately reflects the reality of the encounter. These may appear to be minor differences between broadly similar accounts, but in a close case, such as the one at bar, minor differences in the sequence of events, gestures, and credibility of witnesses matter a great deal.

Crediting Defendant's testimony, the Court finds that Mitchell shook his head to indicate that Special Agent Small did not have consent to search his person; even if a reasonable officer were to view Mitchell's conduct as ambivalent or contradictory, raised palms coupled with a shaking head plainly do not supply "unequivocal" consent.  Consequently, the government cannot meet its burden of demonstrating that Mitchell voluntarily permitted the search.  On this basis alone, the evidence must be suppressed.

Moreover, even assuming that Mitchell did not shake his head in refusal, in context, raising his arms is, at best, ambiguous.  Unlike after his previous requests, Special Agent Small did not wait for unequivocal verbal confirmation of Mitchell's consent or seek to clarify what

Mitchell meant.  Stated differently, the Court is incredulous of Special Agent Small's statement

that Mitchell "just stood there" with his arms raised.  The Court has listened intently to this

portion of the recording and finds that approximately one second elapses between the moment

Special Agent Small completes his question and when he begins to search Mitchell's person.

One second is hardly enough time to draw an inference of consent from raised palms in this

context; indeed, it is hardly enough time to respond at all.  Therefore, even if Mitchell had not

shaken his head, Special Agent Small *still* would not have had unequivocal consent to search

Mitchell.

      b.   *Any consent Mitchell gave was the product of coercion.*

Even if the Court were to find that Mitchell had not shaken his head and even if it were to

believe that Mitchell's raised palms indicated consent in this situation, the Court would

nonetheless grant the instant Motion because the Court believes that any apparent consent would

not have been freely given.  First, Mitchell was never informed that he was free to withhold

consent; while this factor is not dispositive, it remains a "relevant fact to consider" in assessing

the voluntariness of putative consent.  *United States v. Broomfield*, 201 F.3d 1270, 1275 (10th

Cir. 2000).  The Court finds that this factor weighs particularly heavily where, as here, the officer

sometimes phrases his requests in the imperative, which would indicate to any reasonable

interlocutor that the officer is exercising his authority and demands compliance.  *See, e.g.*,

Recording at 2:40 ("Give me permission to search your room; is that all right?").

Second, Mitchell was confined aboard the train in a relatively small space.  At the

hearing, the government made much of the fact that the Superliner's narrow staircase was,

allegedly, located between Mitchell and Special Agent Perry, presumably in an effort to

insinuate that Mitchell was not genuinely restricted in his movement.  *See, e.g.*, Hr'g T. at 139-40.  This is folly.  Even assuming the government's description of the scene, it would be a matter of a few steps for Special Agent Perry to block the stairs if he so desired.  Further, to imagine that Mitchell had a credible means of egress in the event that the special agents gave chase only serves to demonstrate how truly limited his movement was; the notion that Mitchell could have escaped by ascending a twenty-inch-wide staircase, crossing through to the next car, and then descending that car's equally narrow staircase, all while federal agents are in pursuit and passengers are, presumably, milling about the top floor of the train, is simply absurd.  *See, e.g. Id.* at 141 ("So the total distance from the stairwell and Car 431 to an exit in another car, we're talking about a matter of dozens of feet, but certainly not miles or anything, is that correct?").  Rather than embrace this contrivance, the Court finds that Mitchell was confined in the train car at the time Special Agent Small requested consent to search his person and that this limitation of motion, coupled with the other factors, pressured Mitchell to consent to the special agent's request.

Third, the Court credits Mitchell's testimony that Special Agent Perry was standing only a few feet away when Special Agent Small requested consent to search Mitchell's person and that Special Agent Perry's presence "made me believe that I was not allowed to go around him," much less refuse the special agents' requests.  *See, e.g.*, *Id.* at 174-75; 218.  Without delving into the minutiae of the complex quadrille described by the parties, the Court notes that even if Special Agent Perry stood fifteen or twenty feet from Mitchell, the government acknowledges that he was "covering" Special Agent Small; consequently, his presence still would have exerted pressure on Mitchell to acquiesce to Special Agent Small's request.  *Id.* at 119.

Fourth, while the corridor was accessible to other passengers and Amtrak personnel, from the testimony given, the Court finds that, at least during the latter portions of the encounter, there was no one in the hallway other than the two agents and Mitchell, further isolating Mitchell and adding coercive pressure to any request for consent.  *Id.* at 218.

Fifth, it appears, both from the recording and the witnesses' testimony, that early on in the encounter, Mitchell tried, albeit half-heartedly, to cut off the special agent's questioning.  As soon as Special Agent Small began to question Mitchell in earnest, Mitchell repeatedly attempted to interject and break away to speak to an Amtrak representative about his ticket.  *See* Recording at 1:17.  *See also* Hr'g T. at 30.  The government's argument that Mitchell's concern about the ripped ticket was feigned or misplaced is a red herring.   The actual importance of a physical Amtrak travel document is irrelevant for these purposes:  Mitchell indicated at least three times that he wanted to walk away to speak to someone and each time Special Agent Small either ignored him or told him that it was "fine," the plain implication being that Special Agent Small was directing the encounter and that Mitchell should remain with him to answer his questions. *Id.*  While Mitchell did eventually speak to someone regarding the ticket and had his concerns allayed, Special Agent Small's refusal to break off the conversation and his insistence on continuing his questioning weighs, in the Court's considered opinion, against finding that consent was freely given.

Finally, in the context of the encounter, Special Agent Small's failure to secure verbal consent is striking.  Notwithstanding the government's intimation to the contrary, this is the first time during the conversation that Mitchell purportedly gave his consent solely in the form of a gesture.  While a "defendant's silence and acquiescence may support a finding of voluntary

16

consent," *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999), the Court believes that this factor supports the opposite proposition where, as here, silence breaks a long pattern of affirmative verbal responses.

However, neither of the Special Agents drew his weapon, neither agent used particularly aggressive language or appears to have touched Mitchell prior to the pat-down, and the agents never requested that Mitchell return to the police station with them prior to his arrest. Nonetheless, the Court finds that on these facts the government cannot meet its burden and demonstrate that Mitchell consented voluntarily.  Without consent, the entire search must fail as unconstitutional; the facts as known to Special Agent Small prior to the pat-down plainly do not support a finding of probable cause to arrest and there has been no suggestion that Special Agent Small believed Mitchell was armed, which might support a brief protective frisk under *Terry*. *See United States v. Rodriguez,* 739 F.3d 481, 485 (10th Cir. 2013) (Brief "pat-down" searches for weapons are permitted during *Terry* stops only where the "officer reasonably believes [an individual] might be armed and dangerous.").  Indeed, the government in its brief addresses only the issue of whether probable cause existed *after* Special Agent Small felt a firm object, consistent, in his experience, with smuggled contraband, in Mitchell's groin area.  *See* Doc. 29 at 21-23.

## IV.    Exclusion of Evidence

It is settled law that, "[s]ubject to a few exceptions, evidence obtained in violation of the Fourth Amendment will be suppressed under the exclusionary rule."  *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).  The exclusionary rule encompasses both "evidence obtained during the illegal police conduct" and "any other evidence deemed to be 'fruit of the poisonous

tree.'"  *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108 (10th Cir. 2006).  Here, the cocaine in question was obtained during an illegal search, such that the nexus between the constitutional violation and the discovery of the relevant evidence is readily apparent.  Moreover, the government has not argued that any of the exceptions to the exclusionary rule applies in the case at bar.  *United States v. Rodriguez*, 836 F. Supp. 2d 1258, 1276 (D.N.M. 2011) ("if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies.").  Therefore, the cocaine discovered on Mitchell's person must be suppressed.

Finally, the Court agrees with Mitchell that a statement made after an illegal seizure is presumptively inadmissible; the burden is on the government to establish that the statement was both voluntary and sufficiently separated from the Fourth Amendment violation.  *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) ("When a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also establish a break in the causal connection between the illegality and the evidence thereby obtained.") (internal quotation marks and citations omitted).  However, the Court is unaware of whether any custodial statement is at issue in this case; other than a general reference to the suppression of custodial statements in Defendant's opening brief, the parties have not addressed this matter, even during the meandering six hours of testimony and argument on the Motion.  Consequently, the Court cannot determine whether Mitchell made any custodial statements after his arrest and, if so, whether they should be suppressed.

## CONCLUSION

Because the Court finds that Mitchell did not consent to a physical search of his person and because, in context, any consent would have been coerced, the Court holds that the search violated the Fourth Amendment and any evidence obtained therefrom must be suppressed.

**IT IS THEREFORE ORDERED** that the Defendant's Motion is **GRANTED**.

Dated this 10th day of February, 2015.

_____
MARTHA VAZQUEZ
United States District Judge

19